FILED
CLERK, U.S. DISTRICT COURT
03 MAR 03 PM 1:35
DISTRICT OF UTAH
BY: DEPUTY CLERK

PAUL A. TURCKE Idaho Bar #4759
MOORE SMITH BUXTON & TURCKE, CHARTERED
Attorneys at Law
225 North 9th Street, Suite 420
Boise, Idaho 83702
Telephone: (208) 331-1800
Facsimile: (208) 331-1202

PAUL MORTENSEN Utah Bar #2331
P.O. BOX 1294
Centerville, Utah 84014
Telephone: (801) 292-7059
Facsimile: (801) 292-7059

STEPHAN H. ANDRANIAN California Bar #220635
LAW OFFICES OF STEPHAN H. ANDRANIAN
485 E. 17th Street, Suite 390
Costa Mesa, CA 92627
Telephone: (949) 646-8892
Fax (949) 722-8416

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UTAH SHARED ACCESS ALLIANCE, INC.; JARED MILES; LAKE POWELL WATERWORLD, INC.; DOOPOWELL, INC.; AMERICAN WATERCRAFT ASSOCIATION, INC.; AND THE BLUERIBBON COALITION, INC., Plaintiffs, vs. UNITED STATES NATIONAL PARK SERVICE, an Administrative Agency within the U.S. Department of Interior; FRAN P. MAINELLA, in her official capacity as Director, National Park Service; KITTY ROBERTS, in her official capacity as Superintendent, Glen Canyon National Recreation Area , Defendants. | Civ. No. ______________ COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF 2:03CV-0275 DAK |

## I. NATURE OF ACTION

1. Plaintiffs Utah Shared Access Alliance ("USA-All"), Jared Miles, Lake Powell Waterworld ("Waterworld"), Doo Powell, Inc. ("DooPowell"), American Watercraft Association ("AWA"), and the BlueRibbon Coalition, Inc. ("BlueRibbon"), seek declaratory and injunctive relief requiring Defendants, Fran P. Mainella, Kitty Roberts and the United States National Park Service, to acknowledge and adhere to controlling law and policy in their management of personal watercraft ("PWC") access to the Glen Canyon National Recreation Area ("GCNRA"). Lake Powell is a human-made impoundment in the GCNRA nationally known for its PWC and other water-based recreation opportunities.

2. Plaintiffs challenge Defendants' unauthorized actions and failures to act in managing PWC access to the GCNRRA. More specifically, Plaintiffs challenge Defendants' illegal prohibition of PWC access to the GCNRA and Defendants' unreasonable delay in promulgating a new rule authorizing PWC access to the GCNRA, in violation of applicable laws, rules and regulations made reviewable under the Administrative Procedure Act, 5 U.S.C. §551, et seq. (the "APA").

3. The unlawful and procedurally deficient actions and Defendants' unlawful failure to take action have resulted in past, present and anticipated future adverse effects on Plaintiffs' recreational, aesthetic and economic interests and their enjoyment of the GCNRA.

## II. JURISDICTION AND VENUE

4. Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action arises under laws of the United States, the complained-of conduct creates an actual, justiciable controversy, and is made reviewable under the APA, 5 U.S.C. §§ 701-706.

5. Venue is proper in this Court under 28 U.S.C. § 1391(e) because the federal judicial District of Utah constitutes the venue where (1) a substantial part of the events or omissions giving rise to these claims has occurred; (2) a substantial part of the property that is the subject of these claims is situated; or (3) one or more plaintiffs reside.

## III. PARTIES

6. Plaintiff Utah Shared Access Alliance is a Utah non-profit corporation representing individuals and organizations having a combined membership of approximately 5,500 members. USA-All represents individuals and families who enjoy access and recreation available throughout Utah, including PWC access to Lake Powell. USA-All members have concrete plans to continue to enjoy PWC access to Lake Powell in the future to the extent authorized by Defendants.

7. Plaintiff Jared Miles is an individual residing in Sandy, Utah. Mr. Miles owns PWC, has operated these craft on Lake Powell for approximately twelve (12) years, and has concrete plans to conduct such activities in the future to the extent authorized by Defendants.

8. Plaintiff Lake Powell Waterworld ("Waterworld") is an Arizona corporation located in Page, Arizona. Ms. Freddie Hancock manages and is an owner in Waterworld, which is a multi-faceted service and retail business focusing on water-based recreation at Lake Powell. Waterworld's operation includes a full retail showroom featuring PWC as well as all-terrain vehicles, PWC rentals, a service shop, a fiberglass and fabrication shop, boat storage, and an "on-lake" management business for Lake Powell-based houseboats. Waterworld's viability relies heavily, if not entirely, upon PWC access to Lake Powell.

9. Plaintiff Doo Powell, Inc. ("DooPowell") is an Arizona corporation located in Page, Arizona. Mr. Tim McDaniels co-owns DooPowell with his wife Sharon. Together they oversee and operate DooPowell, which is a full-service PWC shop including retail, rental, maintenance and repair, and parts/supplies services. DooPowell's viability relies heavily, if not entirely, upon PWC access to Lake Powell.

10. Plaintiff American Watercraft Association ("AWA") is a not-for-profit corporation and is the nation's largest PWC rider's organization, conducting a proactive effort to ensure continued ability to access and enjoy the nation's public waterways. AWA's efforts have specifically addressed Lake Powell and AWA members have visited Lake Powell via PWC, and have concrete plans to do so in the future to the extent authorized by Defendants.

11. Plaintiff BlueRibbon Coalition, Inc. ("BlueRibbon") is an Idaho nonprofit corporation with over 12,000 individual, business and organizational members representing a total of approximately 600,000 recreationists and outdoor enthusiasts. BlueRibbon members have a long-standing interest in protecting the natural resources and recreational access addressed herein. BlueRibbon regularly works with resource managers to provide recreation opportunities, resource protection, and to promote cooperation between visitors and resource managers, and between resource visitors with diverse interests. BlueRibbon members have visited Lake Powell via PWC, and have concrete plans to do so in the future to the extent authorized by Defendants.

12. Defendant United States National Park Service ("Park Service") is an administrative agency of the United States within the Department of Interior charged with

managing the resources of Park Service lands and waters, including the Glen Canyon National Recreation Area ("GCNRA"), in accordance with applicable federal laws and regulations.

13. Defendant Fran P. Mainella is the Director of the National Park Service and is therefore the Park Service official with ultimate responsibility for and supervision of management activities affecting the GCNRA. Defendant Mainella is sued in her official capacity.

14. Defendant Kitty Roberts is the Superintendent of the GCNRA, which is a sub-unit of the National Park Service. Defendant Roberts supervises and has immediate responsibility for management activities within the GCNRA. Defendant Roberts is sued in her official capacity.

## IV. GENERAL ALLEGATIONS

### A. History of Lake Powell and the Glen Canyon National Recreation Area.

15. The GCNRA is located in the Colorado Plateau region, which is a desert region of bare rock and dirt, arid shrublands, grasslands, and low-growing pinyon-juniper woodlands. The GCNRA includes 1,254,306 acres of land and water. A small portion of the GCNRA is located in Northern Arizona, but over 90 percent of the CGNRA lies in southern Utah.

16. Lake Powell is a central feature of the GCNRA. The Lake is formed by Glen Canyon Dam on the Colorado River, construction of which was authorized by Congress in 1956 through passage of the Colorado River Storage Project Act. The project's primary purposes were to prevent flooding on the Colorado River, to create a reservoir to meet downstream water requirements, and to generate hydroelectric power. Glen Canyon Dam was constructed between 1960 and 1963.

17. Following completion of Glen Canyon Dam Lake Powell formed along the Colorado River and three tributaries – the Escalante, San Juan, and Dirty Devil Rivers. Lake Powell is approximately 186 miles long, and typically includes a surface area of about 160,000 acres, or approximately 15 percent of the GCNRA. Lake Powell is the second largest reservoir in North America.

18. The GCNRA was established in 1972 with Congress' passage of Public Law 92-593. The GCNRA is a National Recreation Area managed by the U.S. National Park Service. The GCNRA adopted a general management plan in 1979 which divided the Recreation Area into four (4) zones.

19. Lake Powell's entire surface and about half of its shoreline lies within the "Recreation and Resource Utilization Zone." This zone is managed to maintain natural processes while allowing mineral leasing, livestock grazing, utility rights-of-way, transportation systems, and recreation activities including motorized recreation such as scenic touring and boating. The general management plan specifically identifies speedboating, water-skiing and houseboat touring as appropriate in the Recreation and Resource Utilization Zone.

20. None of Lake Powell's surface, but about half of its shoreline, lies within the Natural Zone. This zone is managed to maintain isolated, natural processes and consumption of renewable resources that are subject to the protection of recreation values of the area. The 1979 management plan recommended formal Wilderness designation for this zone, but Congress has never made such a designation.

21. The city of Page, Arizona lies about 2 miles from Glen Canyon Dam and was established as a housing and staging area during Dam construction. Page now has a population

of about 8,500 permanent residents. Page is the largest gateway community to the GCNRA and its population swells considerably during the tourism season. Individuals and entrepreneurs in Page have adapted to these populations and visitation trends.

22. The GCNRA is a major regional recreation resource. It receives up to 2.7 million visitors annually, the majority of which are associated with the water-based recreation of Lake Powell. Boating is both the primary means of access as well as the focus of Lake-based recreation. Boats regularly seen on the Lake include multi-level houseboats, ski boats, fishing boats of all sizes and configurations, and personal watercraft. Some visitors bring their own boats, while many rent all or some of the water craft they will use during their visit from one of many local businesses catering to such rental demand. In addition to boating for its own sake, visitors to Lake Powell use boats in conjunction with land-based exploring and recreation, as well as for fishing. While native riverine fishes have been effectively eliminated from what is now the stillwater portion of Lake Powell, they have been supplanted by a regionally-recognized sportfishing opportunity for striped bass and smallmouth bass, which constitute about 80 percent and 20 percent, respectively, of the annual Lake Powell game fish harvest.

23. PWC-oriented recreation is a significant attraction to GCNRA visitors. Up to 50 percent of all GCNRA visitors operate PWC during their visit. Twenty-two percent of PWC users identify PWC as their primary watercraft used in the GCNRA. For houseboat travelers at Lake Powell, 39 percent also include at least one PWC in their flotilla, while 25 percent of other powerboat travelers at Lake Powell similarly include at least one PWC.

24. PWC-oriented businesses throughout the region rely on business associated with

Lake Powell. PWC rental shops in Salt Lake City, Utah, and Phoenix, Arizona, which are about 390 and 275 miles from Glen Canyon Dam, respectively, report about 40 percent of their PWC rentals are to customers trailering the PWCs to Lake Powell. The PWC shops in Page and southern Utah, like Waterworld and DooPowell, report that PWC opportunities at Lake Powell are the sole support for their businesses given the lack of nearby alternative areas for PWC use.

**B. Personal Watercraft Regulatory Background.**

25. The Park Service is granted broad statutory authority to manage and regulate water activities in areas of the National Park System.

26. The Park Service manages diverse lands and waters, ranging from pristine areas formally designated as Wilderness where humans have had minimal or no impact on the physical environment to Recreation Areas like Lake Powell where humans have substantially altered natural features and processes to serve certain human needs.

27. In exercising its regulatory authority the Park Service acknowledges that differences in the enabling legislation and physical resources of the varied subunits within its jurisdiction might make a specific activity entirely appropriate in one Park Service-managed subunit while wholly inappropriate in another.

28. Among the many activities within the Park Service's regulatory oversight is personal watercraft access. Personal watercraft ("PWC") are boats less than four metres (about 13 feet) in length that utilize an inboard engine-powered jet pump as the primary means of propulsion. Unlike other boats, PWC lack an open hull capable of carrying a load or retaining water, and are designed so that operators or riders are positioned on, rather than

within, the hull. PWC come in a variety of models which can safely accommodate single or multiple riders, and are commonly known by their trademarked names such as JetSki, WaveRunner and SeaDoo.

29. In May, 1998, an organization known as the BlueWater Network ("BlueWater") submitted a petition to the Park Service requesting that the Park Service conduct a rule-making to address PWC access to Park Service-managed waters. BlueWater is generally opposed to PWC use within the Park Service system. Apparently in response to BlueWater's request the Park Service published a proposed rule in the Federal Register on September 15, 1998. 63 Fed.Reg. 49312 (Sept. 15, 1998). Public comment was permitted to this proposed rule until November 16, 1998.

30. The Park Service received nearly 20,000 comments on the proposed rule. Some of these comments were submitted by Plaintiffs or Plaintiffs' members.

31. On March 21, 2000, the Park Service submitted a final rule addressing PWC use in Park Service-managed waters. 65 Fed.Reg. 15077 (Mar. 21, 2000). The Park Service's final rule purported to take "a conservative approach to managing PWC use...." Id. at 15078. The final rule reflects the Park Service's decision to "prohibit[ ] PWC use in areas of the National Park System unless we determine that PWC use is appropriate for a specific area based on that area's enabling legislation, resources, values, other visitor uses, and overall management objectives." Id.

32. The final rule presents two methods by which PWC use might be authorized. The first method, available in only ten (10) specified subunits, is via the applicable Park Superintendent's Compendium, a locally-based procedure described in 36 C.F.R. sections 1.5

and 1.7. These ten (10) areas are listed in Table 1 of the final rule. The second method, available in only eleven (11) specified subunits, is via special regulation, which involves a public process providing full disclosure and participation opportunities consistent with the National Environmental Policy Act. These eleven (11) areas are listed in Table 2 of the final rule. For areas not specified on either of the aforementioned lists the final rule constitutes a decision to prohibit further PWC use.

33. The final rule also contains a "grace period" in which PWC use can continue on specified water bodies pending completion of one of the applicable authorization methods. The "grace period" is defined in the final rule as beginning April 20, 2000, and ending April 22, 2002. 65 Fed.Reg. 15078.

34. The final rule included the GCNRA, and therefore Lake Powell, in the Table 1 areas. Thus the final rule reflects the Park Service's decision, generated via notice-and-comment rule-making, that PWC use could continue on Lake Powell until at least April 22, 2002, and could be authorized, or restricted, as determined by the GCNRA Park Superintendent through the Compendium process.

35. The final rule presents the reason for selection of the ten (10) Table 1 areas, explaining:

> A review of the legislation establishing these ten Park Designated areas shows that water-related recreation was a primary purpose for these ten parks and they are characterized by substantial motorized use. Nine of the park areas contain man-made lakes created by the construction of dams, and one park area has open ocean, or bay waters. It has been our experience that visitors to all ten areas appear generally to expect and accept a variety of motorized boating, including PWCs.

65 Fed.Reg. 15078-15079.

36. The final rule goes even further in presenting specific findings regarding the propriety of PWC use at Lake Powell. After explaining why PWC "is inappropriate in most areas of the National Park System, the final rule states:

> We also recognize that PWC use appears to be appropriate in certain park areas. It is clear that Congress intended the NPS to manage an active motorized water-based recreation program on the large man-made lakes of Lake Mead and Glen Canyon National Recreation Areas and it seems appropriate for PWC use to be part of that recreation program.

65 Fed.Reg. 15079-15080.

**C. Litigation-Driven Changes to the Personal Watercraft Rule**

37. Management schemes selected by federal administrative agencies rarely enjoy universal support. Despite having requested the rule-making process in the first place, BlueWater was apparently particularly dissatisfied with the March, 2000, PWC final rule. On August 31, 2000, BlueWater and others filed suit against Defendants' predecessors in office in U.S. District Court for the District of Columbia challenging the PWC final rule.

38. Defendants in the BlueWater suit filed an answer on November 13, 2000, in the waning days of the Clinton administration. On November 15, 2000, AWA and the Personal Watercraft Industry Association ("PWIA") moved to intervene as defendants. No briefing or litigation schedule was ever necessary in the BlueWater suit, as the parties initiated settlement negotiations early in the litigation.

39. In December, 2000, BlueWater and the Park Service entered a settlement agreement. On December 20, 2000, they filed a joint motion for approval of the settlement agreement and for dismissal of the complaint upon the terms stated in the agreement. On

December 22, 2000, AWA and PWIA, whose motion to intervene was still pending, filed an opposition to the settlement agreement.

40. On April 11, 2001, the District Court issued a Memorandum and Order denying the AWA and PWIA motion to intervene. On April 12, 2001, the District Court issued an Order granting the joint motion for approval of the settlement agreement and dismissing the complaint with prejudice based on the terms of the settlement agreement. The District Court retained jurisdiction for enforcement of the settlement agreement.

41. The BlueWater settlement purported to make several changes to the March, 2000, PWC rule. The "grace period" was extended until September 15, 2002, for eight (8) of the ten (10) Table 1 areas, including Lake Powell. However, the Park Service forfeited the ability of Park Superintendents for these eight (8) areas to authorize PWC access via the Compendium process, for the BlueWater settlement specified that the specified areas "will only authorize PWC use by promulgating Special Regulations as described in the Final Rule." BlueWater Settlement at ¶ 4. The BlueWater contained additional provisions, including an agreement by the federal Defendants to pay the BlueWater plaintiffs $16,500 for any claims they might present for attorneys fees and costs.

42. In entering the BlueWater settlement the Park Service intended to promulgate special regulations for Lake Powell and other "Table1" areas so as to allow uninterrupted PWC use to those areas. In entering and defending the BlueWater settlement the Park Service emphasized its desire to comply with the schedule imposed by the agreement for Lake Powell so that a special regulation could be completed and implemented prior to September 15, 2002.

43. In denying intervention and approving the settlement agreement, The District Court in the BlueWater case stressed that the BlueWater settlement was a "process-based settlement that in no way impacts or impairs any of the Proposed Intervenors' substantive rights" and emphasized that AWA and PWIA would be able to "participate fully in [the] decision-making process" contemplated by the BlueWater settlement and to challenge final Park Service decisions about PWC use.

**D. Lake Powell Personal Watercraft Rule-Making and Recent Developments.**

44. Federal agencies sometimes fail to complete planning processes according to either internal or court-imposed schedules. Following adoption of the BlueWater settlement the Park Service attempted to outline and implement a method for generating special regulations for the subunits where the Park Service determined PWC use might reasonably continue.

45. For a variety of reasons, which might include but not be limited to, deficiencies or changes in funding, shortages of human resources, inefficiency or delay associated with changes in leadership and other personnel during the transition between presidential administrations, shifting agency priorities, logistical and technical challenges, and human nature, the special regulation process began to fall behind the schedule which the Park Service knew to be necessary to comply with the BlueWater settlement.

46. The Park Service realized that it could not possibly complete special regulations within the timeframe stated in the BlueWater settlement. On February 8, 2002, attorneys in the U.S. Department of Justice wrote a letter to BlueWater's counsel advising that the "grace period" was not long enough and requesting a two-year extension. On February 28, 2002,

BlueWater's counsel responded in writing and stated that BlueWater would not agree to the requested extension.

47. As the end of the grace period approached affected Park Service subunits made it generally known that the special regulations would not be completed in time. For example, draft environmental impact statements ("DEIS"), required by the special regulation process as defined in the BlueWater settlement, had not yet been released, and numerous events were considered necessary after publication of a DEIS for final special regulations to be completed.

48. Negative effects associated with the impending PWC closure began to occur in affected areas, including those near Lake Powell. In Nevada, individuals and local businesses filed suit on September 5, 2002, in U.S. District Court for the District of Nevada. These plaintiffs enjoyed aesthetic and economic benefits from PWC use at Lake Mead, a reservoir similar to Lake Powell over 200 miles downstream on the Colorado River. In part, the suit alleged the BlueWater Settlement illegally attempted to alter the March, 2000, final rule and asked the Nevada District Court to enter a declaration clarifying the relationship between the final rule and the BlueWater settlement and further sought an injunction preventing enforcement of the BlueWater settlement relating to PWC use at Lake Mead. A motion for preliminary injunction and supporting pleadings was filed concurrently with the complaint.

49. On September 6, 2002, federal Defendants and BlueWater filed a joint motion in the District of Columbia suit to modify the BlueWater settlement. The proposed modification essentially extended the "grace period" until November 6, 2002, for seven (7) areas including Lake Mead and Lake Powell. At portions of Lake Mead the "grace period" was extended until January 1, 2003. At that time the Park Service believed it could complete and finalize the

special regulation process authorizing PWC access to Lake Mead prior to January 1, 2003. The D.C. Court granted the joint motion by order dated September 9, 2002.

50. At Lake Mead and Lake Powell, there is some PWC use throughout the year but the majority of use occurs between mid-April and mid-October. As a result, the extension of the "grace period" until November 6th effectively avoided a mid-season ban on PWC use at the end of the 2002 season on these waters.

51. The Las Vegas plaintiffs allowed their motion for preliminary injunction to be deemed "inactive" following the "grace period" extension, but they "activated" their motion in mid-December and the Nevada Court set a hearing date of December 31, 2002, for the motion.

52. On December 26, 2002, the federal Defendants and BlueWater filed another joint motion with the D.C. Court seeking to modify the BlueWater settlement. On December 26, 2002, counsel for the Las Vegas plaintiffs sent a letter to the Nevada Court requesting that the Court vacate the December 31, 2002, preliminary injunction hearing. The Nevada Court issued an order on December 27, 2002, vacating the hearing.

53. Also on December 27, 2002, the Lake Mead National Recreation Area issued a news release indicating the "grace period" was being further extended at Lake Mead until April 10, 2003. While the Lake Mead rule-making process was not completed, the news release stated the Lake Mead Final EIS and proposed rule were slated for release by January 10, 2003, and that "the final rule allowing continued PWC use should be issued by spring 2003."

54. The Lake Powell rule-making process has not moved as quickly as the Lake Mead process. A Draft EIS was published for the Lake Powell rule on September 13, 2002.

A proposed rule addressing Lake Powell PWC use was published in the Federal Register on January 17, 2003. 68 Fed.Reg. 2466 (Jan. 17, 2003). According to the proposed rule for Lake Powell, PWC use would be authorized on most of the Lake's surface, subject to prohibitions of PWC use in specified portions of some tributaries and "flat wake" speed restrictions in other specified areas.

55. Plaintiffs have participated in the Lake Powell rule-making process to the extent allowed by law. Plaintiffs generally support the proposed rule for Lake Powell and have so stated at various meetings and through their written comments to the Draft EIS and proposed rule. Plaintiffs have also attempted to do anything within their power to expedite the rule-making process.

56. Despite Plaintiffs participation and efforts, Defendants acknowledge the Lake Powell rule-making process will not result in a final rule earlier than "well into the summer season." Following Defendants' January, 2003, statements regarding the rule-making process, Plaintiffs have determined that there is no option to preserve the 2003 PWC season at Lake Powell other than through judicial intervention, and therefore bring this action.

## V. FIRST CAUSE OF ACTION

(APA – Violation of Rule-Making Requirements)

57. Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 56 as if fully set forth herein.

58. Prior to implementation of the BlueWater settlement, Lake Powell and other affected NPS waterways were governed by NPS rules promulgated via notice and comment rule-making in accordance with the APA.

59. Defendants' settlement agreement with the BlueWater changed the regulatory scheme affecting PWC access to NPS waterways, including Lake Powell, just as a change in administration was set to occur. Prior to modification via the BlueWater settlement, local NPS officials could have unilaterally decided to authorize PWC access to Lake Powell via their Compendium authority. Following the settlement agreement, PWC access to Lake Powell could only be authorized through another more elaborate, costly and time-consuming rule-making process.

60. The terms of the BlueWater settlement were never disclosed or analyzed through any APA rule-making process or any other format providing public disclosure and an opportunity for public input.

61. Regardless of Defendants' intentions in entering the BlueWater settlement, the immediate reality is that Lake Powell will be closed to PWC access at the "opening" of the 2003 season, and PWC access will likely remain prohibited until at least August of 2003. Thus, the BlueWater settlement will have reversed a publicly-generated rule and banned PWC access to Lake Powell.

62. Defendants' actions and inactions described above fail to properly acknowledge or protect the due process rights of many non-parties to the BlueWater settlement, are made reviewable through the APA and are arbitrary, capricious, or otherwise not in accordance with law; contrary to constitutional right or power, privilege or immunity; in excess of statutory jurisdiction, authority, or limitations; without observance of procedure required by law, or short of statutory right; or otherwise in violation of the APA, 5 U.S.C. § 706(2), or represent agency action unlawfully withheld or unreasonably delayed, in violation of the APA, 5 U.S.C.

§ 706(1).

63. Plaintiffs have suffered, and will continue to suffer, substantial and irreparable injury to their procedural rights, their aesthetic and recreational use and enjoyment of the GCNRA, and to their economic interests associated with PWC-oriented recreation at Lake Powell. These injuries will go unredressed absent immediate judicial relief.

## VI. SECOND CAUSE OF ACTION

(APA – Unreasonable Delay in Completing New Rule)

64. Plaintiffs reallege and incorporate by reference the allegations of paragraphs 1 through 63 as if fully set forth herein.

65. Defendants have at all times relevant hereto anticipated and intended to complete all necessary reviews and complete rule-making addressing PWC access to Lake Powell on or before September 15, 2002. Defendants entered the BlueWater settlement, at least in part, based on this intent.

66. A variety of developments within and beyond Defendants' control have occurred since approval of the BlueWater settlement. The Defendants did not complete the Lake Powell rule-making process prior to September 15, 2002. After the "grace period" was extended Defendants did not complete the Lake Powell rule-making process prior to November 6, 2002. Defendants now acknowledge they will not complete the Lake Powell rule-making prior to the opening of the 2003 spring boating season, and are not likely to complete the process until "well into the summer season."

67. No Park Service analysis has ever concluded PWC use is inappropriate at Lake Powell, and pending analyses of PWC use at Lake Powell have thus far indicated that such use

is appropriate. In the March, 2002, final PWC rule Defendants determined that PWC was appropriate at Lake Powell. During the current BlueWater-driven rule-making process Defendants have similarly found that there are no adverse effects of PWC use justifying elimination of those craft from Lake Powell. Defendants have never concluded through any decision-making process that PWC use caused unjustified adverse impacts or was inappropriate at Lake Powell.

68. Defendants' actions in conducting the Lake Powell rule-making represent only partial or "half-steps" at compliance with applicable legal duties, including self-imposed duties Defendants willfully accepted in the BlueWater settlement.

69. Defendants' actions and inactions described above are made reviewable through the APA and are arbitrary, capricious, or otherwise not in accordance with law; contrary to constitutional right or power, privilege or immunity; in excess of statutory jurisdiction, authority, or limitations; without observance of procedure required by law, or short of statutory right; or otherwise in violation of the APA, 5 U.S.C. § 706(2), or represent agency action unlawfully withheld or unreasonably delayed, in violation of the APA, 5 U.S.C. § 706(1).

70. Plaintiffs have suffered, and will continue to suffer, substantial and irreparable injury to their procedural rights, their aesthetic and recreational use and enjoyment of the GCNRA, and to their economic interests associated with PWC-oriented recreation at Lake Powell. These injuries will go unredressed absent immediate judicial relief.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

1. Determine, declare, and order that Defendants' actions as described herein violate the APA and applicable law and are arbitrary, capricious, abuse(s) of discretion; contrary to constitutional or statutory power or privilege; or not in observance with procedure required by law;

2. Determine, declare, and order that any of Defendants' actions determined to be illegal as set forth above must be declared unlawful and set aside;

3. Determine, declare and order that Defendants' failure or unreasonable delay in taking certain actions violates the APA and applicable law as set forth herein; and order that such actions be taken or properly initiated under appropriate terms established by the Court;

4. Award Plaintiffs their reasonable fees, costs, and expenses of litigation as allowed by the Equal Access to Justice Act, 28 U.S.C. § 2412, et seq., and other laws or rules of the Court; and

5. Grant Plaintiffs such further and additional relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 18th day of March, 2003.

Paul A. Turcke
Stephan H. Andranian
Paul W. Mortensen

Attorneys for Plaintiffs